**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: ) | |
| ) | Chapter 11 |
| APEX LINEN SERVICE LLC, *et al.*,[1] ) | |
| ) | Case No. 20-11774 (LSS) |
| Debtors. ) | |
| ) | (*Joint Administration Pending*) |

**DECLARATION OF CHRISTOPHER BRYAN**
**IN SUPPORT OF FIRST-DAY MOTIONS AND APPLICATIONS**

I, Christopher Bryan, hereby declare under penalty of perjury that the following is true to the best of my knowledge, information, and belief:

1. I am the Managing Member and Authorized Representative of Apex Linen Service LLC ("*Apex Linen*") and its debtor-affiliates Highland Apex Holdings LLC ("*Apex Holdings*"), Highland Avenue Capital Partners LLC ("*Highland Capital Partners*"), Highland Apex GP LLC ("*Apex GP*"), and Highland Apex Management LLC ("*Apex Management*"; and collectively with Apex Linen, Apex Holdings, Highland Capital Partners, and Apex GP, the "*Debtors*").

2. I am familiar with the Debtors' day-to-day operations, business affairs, and books and records.

3. On July 6, 2020 (the "*Petition Date*"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330 (as amended, the "*Bankruptcy Code*"), in the United States Bankruptcy Court for the District of

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable are: Apex Linen Service LLC (9075), Highland Apex Holdings LLC (0537), Highland Avenue Capital Partners LLC (2825), Highland Apex GP LLC (9246), and Highland Apex Management LLC (5476). The location of the Debtors' corporate headquarters is 6375 S. Arville Street, Las Vegas, NV 89118.

Delaware (the "*Bankruptcy Court*"), thereby commencing the above-captioned bankruptcy cases (these "*Chapter 11 Cases*"). In order to minimize the adverse effects of these chapter 11 filings, the Debtors are requesting various types of relief in "first day" motions and applications (collectively, the "*First Day Motions*") that are being filed with the Court.

4. I am submitting this declaration (the "*Declaration*") in support of the Debtors' chapter 11 petitions and First Day Motions in the above-captioned cases. Except as otherwise indicated herein, all facts set forth in this Declaration are based on my personal knowledge, my review of public and nonpublic documents, or my opinion, based on my experience and knowledge of the linen services industry, and the Debtors' operations and financial condition. If called upon to testify, I could and would testify competently to the statements set forth herein.

5. Part I of this Declaration describes the Debtors' businesses and the circumstances surrounding the commencement of these Chapter 11 Cases. In Part II of this Declaration, I substantiate the truth and accuracy of the relevant facts set forth in the First Day Motions filed concurrently herewith.

## I. **BACKGROUND**

### A. **Debtors' Businesses**

6. The Debtors own and operate a commercial linen service based in Las Vegas, Nevada that services the high-volume needs of large-scale hotel and casino resort operators for the laundering of bed linens, towels, and employee uniforms, and for guest dry cleaning.

7. The Debtors' operations have historically been successful and buttressed by a wide customer base. As one of the largest suppliers of laundry, linen, and dry-cleaning services in Clark County, Nevada, the Debtors pride themselves on offering a unique total cost approach to linen service.

8. The Debtors' operations are principally conducted from Apex Linen's corporate headquarters at 6375 Street Arville Street, Las Vegas, Nevada, and they utilize two warehouses also located in Las Vegas, Nevada.  As of the Petition Date, the Debtors employed nearly 200 full time employees.  For the calendar year ended December 31, 2019, the Debtors generated $21,261,943 in revenue.

9. Apex Linen historically operated as Apex Linen Service Inc. (the predecessor of Apex Linen, referred herein as "*ALSI*") until June 2019, when Highland Apex entered into a Unit Purchase Agreement ("*UPA*") with ALSI pursuant to which Highland Apex purchased all of the ownership interests in ALSI for a cash payment in excess of $30 million (the "*Acquisition*").

**B.** **The Debtor's Prepetition Capital Structure**

10. The Debtors' primary lenders and secured creditors consist of Western Alliance Bank ("*Western Alliance Bank*"), Breakwater Credit Opportunities Fund I, LP ("*Breakwater I*"), Breakwater Credit Opportunities Fund II, LP ("*Breakwater II*"; and together with Breakwater I, the "*Breakwater Entities*"), and United Insurance Company of America ("*United*"; and collectively with Western and the Breakwater Entities, the "*Lenders*") under that certain Amended and Restated Loan and Security Agreement among the Lenders, Breakwater Management LP, as agent ("*Breakwater Management*") and certain of the Debtors dated as of October 4, 2019 (as amended, the "*Loan and Security Agreement*").

11. Western Alliance Bank asserts a first-priority lien pursuant to the Loan and Security Agreement and alleges it is currently owed approximately $6,711,000 from a revolving loan with Apex Linen (the "*Revolving Loan*").

12. Additionally, certain of the Debtors are also the borrowers under the Loan and Security Agreement of the following term loans which the Lenders allege are outstanding in the

following approximate amounts: Breakwater I, totaling $1,000,000; Breakwater II, totaling $3,000,000; Western Alliance Bank, totaling $3,000,000 and the United Insurance Company of America, totaling $10,000,000, for a total approximate amount of $17,000,000 (collectively, the "*Term Loans*"). Breakwater Management LP serves as the collateral agent and administrative agent for the Lenders on the Term Loans as well as the Revolving Loan.

13.  The combined aggregate amount of the Terms Loans and Revolving Loan that the Lenders allege is owed under the Loan and Security Agreement is approximately $23,711,000 (the "*Loans*"). The Debtors were current on payments on the Loans through June 2020.

14.  The Debtors also owe an estimated aggregate unsecured debt of approximately $5 million as of the Petition Date. These obligations are generally owed to trade creditors and outstanding operating debts.

15.  The Debtors entered bankruptcy with approximately $200,000.00 in unencumbered cash, and the Debtors expect that post-Petition Date cash flow will continue to be generated going-forward (and the Debtors believe such post-Petition Date receipts constitute the Lenders' cash collateral).

C.    **Reasons For Chapter 11 Filings**

16.  A number of factors led to the filing of the Debtors' chapter 11 filing. The COVID-19 pandemic wrecked havoc on the local and global economy, and, in particular, the industry served by the Debtors. The sharp decline in tourism due to the closure of the Las Vegas hotels and casinos for months caused a precipitous drop in demand for the Debtors' services. As a result, the Debtors were forced to enter in a complete shut down of their operational plant. The Debtors have now begun to restart their operations and ramp back up, as the Las Vegas hotels have begun to reopen and the local economy continues to reopen in phases (thus allowing for tourism in the

area to gradually revert to normal). Therefore, the Debtors aim to exit from these Chapter 11 Cases prepared to continue their operations in an increasingly more favorable environment.

17. In addition, the Debtors were embroiled in litigation against the former principals of Apex Linen concerning the Acquisition. In May 2020, less than a year after closing on that transaction, ALSI and its principal shareholders, Joseph Dramise ("*Dramise*") and Glenn Martin ("*Martin*"), filed an arbitration proceeding against certain of the Debtors.

18. At or about the same time that the parties entered into the UPA, Apex Linen entered into a Consulting Agreement with Dramise pursuant to which he would serve as the CEO of Apex Linen for a term of up to three years. Based on actions Dramise took, Apex Linen believed he was in breach of the Consulting Agreement and, on February 25, 2020, sent him a thirty day notice to cure. When Dramise failed to cure his breaches within the thirty day window, his employment as Apex Linen's CEO was terminated for cause. On or about June 5, 2019, Dramise filed suit in Clark County, Nevada against Apex Linen, Apex Holding, Highland Avenue Capital, and other unknown individuals and entities.

19. As a result of inaccurate representations and warranties made by the sellers in the Acquisition, the Debtors presently have a claim pending with their "representation and warranties insurance" carrier.

20. All of these issues resulted in an ensuing liquidity crisis for the Debtors, and resulted in the Lenders' ability to exercise remedies against the Debtors. The Debtors and their principals entered into discussions with certain of the Lenders. However, those discussions were not consensually resolved, and the Debtors determined, in their business judgment, that Chapter 11 filings were necessary and appropriate to continue to operate the Debtors' business and service the Debtors' customers without interruption.

21. The Debtors accordingly seek to use these filings in order to restructure their liabilities and reorganize their business in a comprehensive and orderly fashion, so as to continue to service their customers in the consistent and high-quality manner to which they are accustomed.

## II. FIRST DAY MOTIONS AND APPLICATIONS

. 22. Concurrently with the filing of the Chapter 11 Cases, the Debtors are filing certain applications, motions, and proposed orders. The Debtors request that the relief described below be granted, as each request constitutes a critical element in achieving the successful restructuring of the Debtors for the benefit of all parties in interest.

23. I have reviewed and discussed with the Debtors' counsel each of the First Day Motions filed contemporaneously herewith (including the exhibits thereto and supporting memoranda) and incorporate by reference any factual statements set forth in the First Day Motions. It is my belief that the relief sought in each of the First Day Motions is tailored to meet the goals described above and, ultimately, will be critical to the Debtors' ability to achieve the goals of these Chapter 11 Cases.

**A.      Debtors' Motion For An Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief (the "*Joint Administration Motion*")**

24. Given the integrated nature of the Debtors' operations, joint administration of these Chapter 11 Cases will provide significant administrative convenience without harming the substantive rights of any party in interest. Many of the motions, hearings, and orders in these Chapter 11 Cases will affect each Debtor entity. The entry of an order directing joint administration of these Chapter 11 Cases will reduce fees and costs by avoiding duplicative filings and objections. Joint administration also will allow the Office of the United States Trustee for the District of Delaware and all parties in interest to monitor these Chapter 11 Cases with greater ease and efficiency.

25. Accordingly, I submit that the Joint Administration Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest.

**B.    Motion of Debtors For Entry of Interim and Final Orders *Nunc Pro Tunc* to the Petition Date Authorizing (I) Continued Maintenance of Existing Cash Management System and Bank Accounts; (II) Use of Existing Forms; and (III) Granting Related Relief (the "*Cash Management Motion*")**

26. By the Cash Management Motion, the Debtors seek to maintain their streamlined cash management system that consists of five checking accounts and a single depository account for payroll (collectively, the *"Bank Accounts"*) in Apex Linen's name.  Three of the Bank Accounts are located at JPMorgan Chase Bank, N.A. ("*Chase*"); one is located at Bank of America ("*BOA*"); and one is located at Alliance Bank of Arizona, a division of Western Alliance Bank ("*Alliance,*" and collectively with Chase and BOA, the *"Banks"*).  The Banks are approved banks in accordance with section 345 of the Bankruptcy Code.

27. Apex Linen uses the Chase checking accounts as the primary accounts in which Apex Linen collects and disburses cash generated by its business, satisfies financial obligations, and centrally controls and monitors funds and available cash.  All deposits flow through both of the Chase checking accounts and most expenditures are paid out of one of the Chase checking accounts.  The other Chase account is used by Apex Linen as a payroll disbursement account.

28. In addition, Apex Linen uses the BOA checking account to fund the corporate credit cards, and the Alliance account for revolver draws and payments, occasional supplier payments, and transfers to and from the Chase accounts.  Apex Linen's integrated use of its Bank Accounts to collect cash and satisfy its financial obligations comprise its "Cash Management System."

29. For a company of Apex Linen's size, it is necessary that the Cash Management System remain intact during the Chapter 11 Cases so that the Debtors' limited staffing can continue to collect revenue and make disbursements as seamlessly as possible.  If the Debtors are required

to alter the manner in which they collect and disburse cash throughout the Cash Management System, the Debtors would have to overextend their scarce human resources.

30. Based on the foregoing, I submit that the relief requested by the Cash Management Motion is necessary and appropriate; is in the best interest of the estates and creditors and should be granted by this Court.

**C.    Motion of Debtors For Entry of Interim and Final Orders (I) Prohibiting Utilities From Altering, Refusing, or Discontinuing Service; (II) Deeming Utilities Adequately Assured of Future Performance; (III) Establishing Procedures for Determining Adequate Assurance of Payment; (IV) Authorizing the Payment of Prepetition Administrative Fees Relating to Utility Services; and (V) Granting Related Relief (the "*Utilities Motion*")**

31. In the normal conduct of its business operations, the Debtors receive services from many utility companies and other providers (collectively, the "*Utility Companies*") for the provision of sewer, water, gas, waste, electric, and other similar utility services (collectively, "*Utility Services*"). In all instances, preserving the Utility Services on an uninterrupted basis is essential to preserve the value of the Debtors' businesses throughout these Chapter 11 Cases. Indeed, any interruption in the Utility Services, even for a brief period of time, would disrupt the Debtors' ability to achieve their chapter 11 objectives. Such a result could seriously jeopardize the Debtors' reorganization efforts and, ultimately, value and creditor recoveries.

32. By the filing the Utilities Motion, the Debtors seek to avoid such a result by requesting that the Utility Companies be prohibited from altering, refusing, or discontinuing Utilities to the Debtors absent further order of the Court.

33. The Debtors expect that they will generate cash flow through their continued business operations that will be more than sufficient to pay all post-petition obligations for Utility Services. Nonetheless, to provide adequate assurance of payment to the Utility Companies, the Utilities Motion also proposes that the Debtors deposit cash in an amount equal to the approximate

aggregate cost of two weeks of Utility Services, calculated as a historical average over the twelve month period ending June 30, 2019, or approximately $57,788.54, into a newly created segregated account (the "*Adequate Assurance Deposit*") within twenty days after the Petition Date.

34. In order for the Debtors to reorganize in the best interest of their creditors, it is imperative that the Utility Companies continue to provide Utility Services in the ordinary course of business. The failure to do so would likely result in immediate and irreparable harm to the Debtors' operations, customer relationships, revenues, and profits, seriously jeopardizing the Debtors' reorganization efforts and, ultimately, recoveries to creditors.

35. Based on the foregoing, I submit that the Utilities Motion is in the best interest of the Debtors' estates, their creditors, and other parties in interest, and should therefore be granted by this Court.

**D.    Debtors' Application For An Order, Pursuant to 28 U.S.C. § 156(c), Bankruptcy Rule 2002(f), and Local Rule 2002-1(f), Appointing Stretto as Claims and Noticing Agent, *Nunc Pro Tunc* to the Petition Date (the "*Claims Agent Application*").**

36. The Debtors have not yet filed their schedules of assets and liabilities, however, the Debtors anticipate that they have more than 200 creditors and parties in interest, many of whom will require notice and are expected to file proofs of claim in the Debtors' Chapter 11 Cases. By the Claims Agent Application, the Debtors seek to appoint Stretto to serve as the claims and noticing agent (the "*Claims and Noticing Agent*") in these Chapter 11 Cases. Stretto's services will include assuming full responsibility for the distribution of notices and the maintenance, processing, and docketing of proofs of claim filed in these cases.

37. Stretto is one of the country's leading chapter 11 administrators with vast experience in noticing and claims processing. Stretto has a proprietary claims management system in which claims are effectively managed for the Office of the Clerk of the Bankruptcy Court. The

Debtors have selected Stretto as the Claims and Noticing Agent because of Stretto's abilities and experience serving in such capacity in Chapter 11 Cases of this size, as well as the reasonableness of its fees.

38. In view of the number of anticipated claimants and parties requiring notice, and the complexity of the Debtors' business, I submit that the appointment of a Claims and Noticing Agent is both necessary and in the best interests of both the Debtors' estates, their creditors, and other parties at interest.

E. **Debtors' Application For Entry of An Order Authorizing the Debtors (I) to Employ and Retain GlassRatner Advisory & Capital Group LLC to Provide the Debtors a Chief Restructuring Officer and Certain Additional Personnel and (II) Designate Jeff Nerland as Chief Restructuring Officer for the Debtors *Nunc Pro Tunc* to the Petition Date (the "*CRO Application*").**

39. After careful consideration of the size and complexity of the Debtors' businesses, as well as the exigencies of the circumstances, the Debtors have determined that the services of experienced restructuring managers will substantially enhance their attempts to maximize the value of their estates.

40. By means of the CRO Application, the Debtors propose to employ Jeff Nerland, of GlassRatner, as the chief restructuring officer ("*CRO*") in these Chapter 11 Cases. Mr. Nerland has thirty-five years of experience as a turnaround advisor and has advised borrowers, secured lenders, bondholders, trade creditors, and equity holders in both out-of-court and in-court proceedings.

41. The resources, capabilities, and experience of GlassRatner and Mr. Nerland are crucial to the success of these Chapter 11 Cases. GlassRatner and Mr. Nerland will provide expertise that complements, and does not duplicate, the services offered by the Debtors' other restructuring professionals. Specifically, Mr. Nerland and other GlassRatner professionals will

be: (a) assisting in all aspects of the Debtors' business activities and operations, including budgeting, cash management, and financial management; (b) negotiating with vendors, customers, and other creditors; (c) reviewing daily operating activity; (d) evaluating liquidity options including restructuring, refinancing, and reorganizing; and (e) acting as a representative of the Debtors in court hearings, as appropriate. The CRO will also assist the Debtors in evaluating and executing restructuring alternatives.

42. I submit that the retention of Jeff Nerland and GlassRatner is appropriate and in the best interests of the Debtors, their estates, creditors, and other parties in interest, and thus the CRO Application should be granted in the Chapter 11 Cases as requested therein.

**F.    Motion of Debtors for Entry of Interim and Final Orders (1) Authorizing Debtors to Pay Certain Prepetition Claims of Critical Vendors and (II) Granting Related Relief (the "*Critical Vendors Motion*")**

43. The Debtors' business depends on the uninterrupted flow of linens, cleaning chemicals, and other products and services. To that end, the Debtors rely on a number of third-party vendors to provide them with the goods and services used in the operation of their businesses. While the Debtors believe that many of their vendors provide invaluable services, the Debtors and their advisors have carefully reviewed and analyzed the Debtors' books and records and consulted with key personnel to identify those vendors of goods and services that are absolutely critical to the Debtors' businesses (the "*Critical Vendors*," and such claims, the "*Critical Vendor Claims*").

44. By the Critical Vendors Motion, the Debtors seek the Court's permission to pay the prepetition Critical Vendor Claims in order to maintain the Critical Vendors' relationship with the Debtors. In return for paying the such claims either in full or in part, the Critical Vendors Motion proposes that the Debtors be authorized to require that the Critical Vendors provide favorable trade terms for the postpetition procurement of goods and services that are essential for maintaining the

Debtors' business. Accordingly, the Debtors seek the authority, but not direction, to enter into trade agreements setting forth customary trade terms (each, a "*Trade Agreement*") when the Debtors determine, in their sole discretion, that payment of the applicable Critical Vendor Claim, in whole or in part, is necessary to the Debtors' postpetition operations.

45. Without the Critical Vendors, the Debtors cannot sustain the high-quality operations that they have worked for years to achieve and would be unable to continue serving their customers, likely losing significant revenue. If the Critical Vendors refuse to provide their goods and services to the Debtors after the Petition Date on account of unpaid prepetition claims, the Debtors would be left scrambling to procure new vendors. The process could take several months and would significantly impact the Debtors' anticipated sales.

46. Based on the foregoing, I submit that the Critical Vendors Motion is appropriate and in the best interests of the Debtors, their estates, creditors, and other parties in interest, and should be granted in the Chapter 11 Cases as requested therein.

**G.    Debtors' Motion for Entry of an Order (A) Authorizing the Debtors to Pay and Honor Certain Prepetition Wages, Benefits, and other Obligations, (B) Authorizing Financial Institutions to Honor and Process Checks and Transfers Related to Such Obligations, and (C) Granting Related Relief (the "*Wages and Benefits Motion*")**

47. The Debtors depend substantially on their 188 full-time employees (the "*Employees*") to meet the maintenance and operational needs of the business while providing service to their customers. The Debtors also rely on and utilize an Independent Contractor to handle the Debtors' accounting and provide other critical office administrative support services.

48. In the ordinary course of their business, the Debtors incur a variety of obligations related to the Employees (the "*Employee Obligations*"), which include, without limitation: obligations related to employee wages and salaries (the *"Wage Obligations"*); an obligation to withhold Employee paycheck amounts to pay federal, state, and local income taxes, as well as

social security and Medicare taxes, on behalf the Employees, and an obligation to make matching payments to match tax (the "*Withholding Taxes*"); obligations related to the reimbursement of certain expenses incurred by employees during the scope of their employment (the "*Expense Reimbursement Obligations*"); obligations to provide and contribute to healthcare and dental plans offered to the Employees (the "*Healthcare Obligations*"); and an obligation to fund the pensions of certain of their skilled Employees subject to a collective bargaining agreement (the "*Engineer Pension Obligations*").  In addition to the Employee Obligations, the Debtors also have an obligation to compensate the Independent Contractor for his services to the Debtors' business (the *"Independent Contractor Obligations"*).

49.   As these Chapter 11 Cases were occasioned in between the Debtors' payroll periods, the Debtors believe that certain of the Employee Obligations and the Independent Contractor Obligations were outstanding as of the Petition Date.  The Debtors also believe that many, if not all, of the claims arising out of these prepetition obligations may be entitled to priority treatment under the Bankruptcy Code.

50.   By the Wages and Benefits Motion, the Debtors seek the Court's authority to pay the prepetition Employee Obligations and the Independent Contractor Obligations.  The Debtors believe that payment of these obligations will enhance value for the benefit of all interested parties because it will help ensure that the Employees, which are central to the Debtors' business operations, continue to provide vital services to the Debtors at this critical time.  Additionally, the Debtors would like to ensure the continued performance of the Independent Contractor, who has played a vital role in assisting the Debtors and their counsel by compiling and producing information related to the Debtors' finances.

51. The Wages and Benefits Motion also requests that that the Debtors be allowed to maintain and honor the Employee Obligations and the Independent Contractor obligations in the ordinary course of their business. The Debtors firmly believe that maintaining such obligations is critical to maintaining positive Employee morale and loyalty during these Chapter 11 Cases. The Debtors' failure to honor the Employee Obligations would cause severe personal hardship to the Employees and likely would result in attrition at a time when the Debtors need the Employees to perform at peak efficiency. Similarly, the Independent Contractor may choose to end his relationship with the Debtors, resulting in disruptions to the services provided to the Debtors' clients at a critical time. Accordingly, the Debtors must be able to pursue all reasonable measures to retain the Employees and the Independent Contractors by, among other things, continuing to honor all wages, benefits, and related obligations, including those that accrued before the Petition Date, and to pay outstanding prepetition Independent Contractors and Employee Obligations.

52. The Debtors believe that they have sufficient funds to pay the amounts described herein in the ordinary course of business by virtue of reserves and anticipated revenue from ongoing business operations. However, as a result of the commencement of these Chapter 11 Cases, and in the absence of an order of the Bankruptcy Court providing otherwise, the Debtors' checks, wire transfers, direct deposit transfers, and electronic fund transfers in respect of the Employee Obligations may be dishonored or rejected by financial institutions.

53. Under the Debtors' accounting and cash management systems, the Debtors can readily identify checks or transfers as relating to payment of the Employee Obligations. Accordingly, the Debtors believe that prepetition checks and transfers other than those for the Employee Obligations will not be honored inadvertently.

54. Based on the foregoing, I submit that the Wages and Benefits Motion is appropriate and in the best interests of the Debtors, their estates, creditors, and other parties in interest, and should be granted in the Chapter 11 Cases as requested therein.

**H.** **Emergency Motion Pursuant to Sections 361 and 363 of the Bankruptcy Code and Bankruptcy Rule 4001 for Interim and Final Orders: (1) Authorizing the Use of Cash Collateral; (2) Scheduling Further Interim Hearing; and (3) For Related Relief (the "*Emergency Cash Collateral Motion*")**

55. By the Emergency Cash Collateral Motion, the Debtors principally request the Court's authority to use the cash collateral asserted by the Lenders in order to provide the funding of approximately $310,000 for payroll to be administered on July 10, 2020.

56. As of the date hereof, the Debtors do not have sufficient unencumbered cash and need liquidity to operate their business. If the Debtors are unable to fund payroll, they will lose employees which, in turn, will likely result in the shutdown of the Debtors' business operations.

57. To avoid such a drastic result, the Debtors have obtained the Lenders' consent (subject to an order acceptable to the Lenders, which the Debtors are currently finalizing with the Lenders) to use cash collateral in order to timely fund payroll. In consideration for the Lenders' consent, the Debtors have agreed to provide the Lenders with adequate protection in the form of a security interest and lien upon all and hereafter acquired assets of the Debtors, but not including any causes of action arising under the Bankruptcy Code or any unencumbered cash of the Debtors existing as of the Petition Date.

58. As these Chapter 11 Cases were filed on an emergency basis, the Debtors have yet to resolve the issues surrounding their attempts to obtain debtor-in-possession financing ("*DIP Financing*"). However, the Debtors are currently in negotiations with the Lenders about obtaining such financing in order to ensure appropriate funding for the administration of these cases. In the interim, the Debtors solely seek the use of cash collateral to fund payroll this week and will seek

to obtain consensual debtor-in-possession financing and further use of cash collateral no later than July 15, 2020.

59. Based on the foregoing, I additionally submit that the Emergency Cash Collateral Motion is in the best interests of the Debtors, their estates, creditors, and other parties in interest, and should be granted in the Chapter 11 Cases as requested therein.

Date: July 9, 2020

By:  */s/ Christopher Bryan*
Christopher Bryan
Authorized Representative of the Debtors