# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re<br><br>APEX LINEN SERVICE LLC, *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 20-11774 (LSS)<br><br>Jointly Administered<br><br>Hearing Date: July 22, 2020, 11:00 a.m. (EDT)<br><br>Re: Docket 11, 18, 30, 36, 52, 68, 74, 75 |

**BREAKWATER MANAGEMENT LP'S OPPOSITION TO DEBTORS':
(1) EMERGENCY MOTION AUTHORIZING DEBTORS TO OBTAIN POSTPETITION
FINANCING, (2) SECOND SUPPLEMENT TO EMERGENCY MOTION
AUTHORIZING USE OF CASH COLLATERAL, AND (3) MOTION TO PAY
CRITICAL TRADE VENDOR CLAIMS**

## I.    INTRODUCTION

1.    Breakwater Management LP ("Agent"), as agent for senior secured lenders Breakwater Credit Opportunities Fund LP, Breakwater Credit Opportunities Fund II, LP, Western Alliance Bank, and United Insurance Company of America (collectively, such lenders are referred to as the "Pre-Petition Lenders"), by and through its undersigned counsel, hereby opposes Debtors' (i) emergency motion to obtain postpetition financing (the "DIP Financing Motion") [ECF No. 75], (ii) second supplement to emergency motion authorizing use of cash collateral (collectively with the underlying motion and first supplement thereto, the "Cash Collateral Motion") [ECF Nos. 18, 36, and 74], and (iii) motion to pay critical trade vendor claims (the "Critical Vendor Motion")

---

[1] The Debtors in the above-captioned chapter 11 cases, along with their case numbers, are ("Debtors"): Apex Linen Service LLC (20-11774) ("Apex Linen"), Highland Apex Holdings LLC (20-11775) ("Highland Apex Holdings"), Highland Avenue Capital Partners LLC (20-11776) ("Highland Partners"), Highland Apex GP LLC (20-11777) ("Highland GP"), and Highland Apex Management LLC (20-11778) ("Highland Management"). Highland Apex Holdings, Highland Partners, Highland GP, and Highland Management will be referred to herein collectively as the "Highland Entities."

SMRH:4823-5137-1203.3

[ECF No. 11]. For the reasons set forth below, Debtors have failed to satisfy the requirements of Bankruptcy Code Section 364(d) to obtain a priming lien debtor-in-possession ("DIP") loan, and the Court should deny the DIP Financing Motion both on an interim and final basis.[2]

2.   Pursuant to the DIP Financing Motion, Debtors seek authority under Bankruptcy Code Section 364(d) to obtain a $4 million DIP financing loan, with a 14% non default interest rate, 21% default interest rate, and between $240,000 and $275,000 in fees (the "Proposed DIP Loan") from Serene Investment Management ("Proposed DIP Lender") that primes Pre-Petition Lenders' $23,711,000 pre-petition secured loans (the "Pre-Petition Loans") (DIP Financing Motion, paragraph 5, pages 2-3). Despite having the burden of proof under Bankruptcy Code Section 364(d)(2) that under Section 364(d)(1)(B) there is adequate protection of the Lenders' blanket lien on the assets of the only Debtors that have any assets (the "Collateral"), **the DIP Financing Motion contains no evidence whatsoever**. In fact, as set forth below, Debtors' own budget attached to the DIP Financing Motion as Exhibit B (the "Budget") demonstrates that Debtors project that based upon use of cash collateral and the Proposed DIP Loan, the Pre-Petition Lenders' position will decline and diminish by $3,734,714 over the next 13 weeks, at which point, Debtors will run out of cash.

3.   Moreover, under Bankruptcy Code Section 364(d)(1)(A), a debtor can obtain a loan that primes the pre-petition lender only if the debtor is unable to obtain "such credit otherwise." As set forth below, Debtors cannot satisfy this requirement. First, since July 11, 2020, the Pre-Petition Lenders and the Debtors were in negotiations for the Pre-Petition Lenders to provide DIP

---

[2] The Agent incorporates its prior limited objection to the Cash Collateral Motion and the Critical Vendor Motion [ECF No. 52]. Debtors' budget attached to the DIP Financing Motion demonstrates that even next week, Debtors cannot operate on cash collateral alone. Debtors currently have use of cash collateral through July 24, 2020. Because Debtors are not entitled to DIP financing under Bankruptcy Code Section 364(d), in addition to denying the DIP Financing Motion, the Court should deny the Cash Collateral Motion and the Critical Vendor Motion, and not allow further use of cash collateral beyond July 24, 2020.

financing.  However, after exchanging several drafts of a term sheet for over a week, on July 19, 2020, Debtors terminated such negotiations without any explanation other than their statement that the most recent draft term sheet from the Pre-Petition Lenders, a copy of which is attached hereto as Exhibit 1, was unacceptable to the Debtors.  The Pre-Petition Lenders remain willing to provide DIP financing.  Further, while the Pre-Petition Lenders' proposal was predicated on a value-preserving prompt dismissal of these cases, the Pre-Petition Lenders would not leave the operating Debtor without resources; indeed, the Pre-Petition Lenders had already proposed to provide significant funding before these cases were filed, and they remain prepared to provide financing of at least an additional $6 million beyond DIP financing to capitalize the operating Debtors' Las Vegas commercial linen service operations coming out of bankruptcy.

4.    Second, Debtors received an offer from another entity (the "Proposed Junior DIP Lender") to make a junior (non-priming) DIP financing loan with no interest, fees or costs (the "Proposed Junior DIP Loan"). The amount of the Proposed Junior DIP Loan was $400,000, but Debtors' Chief Restructuring Officer Jeff Nerland (the "CRO") testified during his deposition on July 20, 2020, that he did not speak with the Proposed Junior DIP Lender about the Proposed Junior DIP Lender making a larger Proposed Junior DIP Loan.  Given that Debtors inexplicably cut off discussions with the Pre-Petition Lenders for DIP financing and the CRO did not even attempt to negotiate an increase of the amount of the Proposed Junior DIP Loan, Debtors have not established that they are unable to "obtain such credit otherwise."

5.    Because Debtors cannot satisfy the requirements of Bankruptcy Code Sections 364(d)(1)(A) or 364(d)(1)(B), the Pre-Petition Lenders respectfully request that the Court deny the DIP Financing Motion.

**II.   A PRIMING DIP LOAN UNDER BANKRUPTCY CODE SECTION 364(d) IS NOT WARRANTED**

6.     As a general principle the Bankruptcy Code recognizes the primacy of pre-petition contractual liens and seeks to preserve the financial interests created thereby. *In Re Mosello*, 195 B.R. 277, 287 (Bankr. S.D.N.Y. 1996).  The ability to prime an existing lien under Bankruptcy Code Section 364(d) is extraordinary, as it displaces bargained-for lien rights, and should not be approved except as a last resort.  *See In re Den-Mark Construction, Inc.*, 406 B.R. 683, 688 (E.D.N.C. 2009); *In re Planned Systems, Inc.*, 78 B.R. 852, 861 (Bankr. S.D. Ohio 1987) (secured creditor to be primed "is entitled to constitutional protection for its bargained-for property interest").  As set forth herein, Debtors cannot satisfy the necessary elements of Bankruptcy Code Section 364(d), and the Court should deny the DIP Financing Motion.

**A.   Debtors Cannot Satisfy the Requirements of Bankruptcy Code Sections 364(d)(1)(B) and 364(d)(2)**

7.     Pursuant to Bankruptcy Code Section 364(d)(1)(B), to grant an equal or priming lien Debtors must establish that there is adequate protection of Pre-Petition Lenders' lien on the Collateral.  *In re Swedeland Development Group, Inc.*, 16 F.3d 552, 564 (3rd Cir. 1994); *In Re Mosello*, 195 B.R. 277, 287-288 (Bankr. S.D.N.Y. 1996).  "Given the fact that super priority financing *displaces liens* on which creditors have relied in extending credit, a court that is asked to authorize such financing must be particularly cautious when assessing whether the creditors so displaced are adequately protected."  *In re Fontainebleau Las Vegas Holdings, LLC*, 434 B.R. 716, 754 (S.D. Fla. 2010) (emphasis in original; internal quotation marks and citation omitted). Moreover, pursuant to Bankruptcy Code Section 364(d)(2), the burden is not on the Pre-Petition Lenders to establish lack of adequate protection.  Rather, Debtors have the burden of proof of the existence of adequate protection.  *Swedeland*, 16 F.3d at 564; *Mosello*, 195 B.R. at 287.

8. Despite having the burden of proof under Bankruptcy Code Section 364(d)(2) that under Section 364(d)(1)(B) there is adequate protection of the Lenders' blanket lien on the Collateral, **the DIP Financing Motion contains no evidence whatsoever**. Not only have Debtors proffered no evidence on the value of the Collateral, they have not even asserted whether the Lenders are oversecured or undersecured, and whether there is an equity cushion in the Collateral. Moreover, the Budget[3] projects that:

   a. Debtors' cash will decline from $33,600 to $25,000 between now and October 23, 2020, the date through which the 13-week Budget runs;

   b. Debtors' accounts receivable will decline from $712,804 to $674,080 during the same time frame[4];

   c. The Proposed DIP Loan will have a balance of $3,687,390 at the end of the same time frame.

9. Thus, even putting aside that Debtors have proffered no evidence or argument as to a comparison of the amount of the Pre-Petition Loans and the value of the Collateral, what the Debtors have proffered – the Budget – demonstrates that from a cash flow perspective and taking into account that Debtors propose to prime the Pre-Petition Lenders, whether the Lenders are oversecured or undersecured, the Debtors project that the Pre-Petition Lenders' position will decline and diminish by $3,734,714 (the sum of the unpaid Proposed DIP Loan and the decline in cash and accounts receivable).

---

[3] Whether the Budget is realistic is not ascertainable since there is no declaration in support of the DIP Financing Motion explaining the assumptions underlying the revenue projections and whether they take into account COVID sensitivity in a place where cases are rising and hotel/restaurant/casino traffic is dropping further than it had been last month. https://www.reviewjournal.com/business/tourism/as-covid-19-cases-rise-fewer-tourists-come-to-las-vegas-2077526/; https://www.8newsnow.com/news/local-news/new-nevada-reports-4th-consecutive-record-breaking-day-for-covid-19-cases-clark-county-exceeds-30k-cases/.

[4] While the Budget runs through October 23, 2020, the term of the Proposed DIP Loan is 12 months. The DIP Financing Motion does not address this discrepancy.

10.     The Proposed DIP Loan imposes additional significant risk on the Pre-Petition Lenders. In addition to the certain decline in the Pre-Petition Lenders' position even if the Budget is accurate and the Debtors do not default under the Proposed DIP Loan, the consequences of Debtors' failure to comply with what may be an overly optimistic Budget are dire - - the Proposed DIP Lender can terminate the Proposed DIP Loan and exercise remedies. Moreover, weeks into these cases, Debtors have not indicated what their exit strategy from bankruptcy is, and this is highlighted in the Proposed DIP Loan. Remarkably, the Debtors are presenting the DIP Financing Motion without the context of an exit strategy (or even a preview thereof) of any kind from these cases. The Proposed DIP Loan is a bridge to nowhere: the Debtors seek to prime the Pre-Petition Lender with $4 million of financing, then propose to operate for 13 weeks **at a loss** of almost $2.7 million (which does not even include professional fees), without providing any context in which such financing and unprofitable operations make any sense. Further, the Debtors offer no evidence or explanation of how these cases will be funded beyond the 13-week Budget. While the Proposed DIP Loan carries a term of one year, the Debtors' own Budget shows that the Debtors will run out of cash by late October/early November. There is no explanation or evidence that the Debtors can survive beyond week 13 without additional funding. Approval of the Proposed DIP Loan will likely result in the Debtors becoming illiquid after 13 weeks with the substantial additional burden on the Pre-Petition Lenders of having $4 million of senior debt in front of them.

11.     Finally, contrary to paragraph 11 of the DIP Financing Motion, the Proposed DIP Lender has not provided a commitment to make the Proposed DIP Loan. By its terms, Exhibit C to the DIP Financing Motion indicates that "this term sheet is non-binding and is merely an expression of interest." In fact, in paragraph 17 of the DIP Financing Motion, Debtors admit that they have not reached agreement with the Proposed DIP Lender on terms. Debtors go on to say

that they believe "once fully negotiated" with the Proposed DIP Lender, the documents will include a set of terms different than those set forth in Exhibit C, and then Debtors set forth those different terms. Debtors ask the Court to approve the Proposed DIP Loan on those different terms, but if the terms ultimately agreed upon are different than those approved by the Court, the agreed upon terms will control (DIP Financing Motion, p. 10, paragraph 17, fn. 3). Thus, there is no agreement for the Proposed DIP Loan for the Court even to consider or approve.

12. Analyzing the facts set forth in paragraphs 7-11 above, Debtors have not offered any consideration whatsoever, let alone adequate protection, for the undisputed diminution in Pre-Petition Lenders' interest that would result from Debtors' proposed priming lien. The Bankruptcy Code requires adequate protection to be provided in one of three ways: (a) periodic cash payments; (b) additional or replacement liens, or (c) other relief constituting the "indubitable equivalent" of the primed creditor's interests in the collateral. See Bankruptcy Code §361; *Swedeland*, 16 F.3d at 564.

13. Irrespective of the value of the Collateral (as to which Debtors have offered no evidence in satisfaction of their burden) and whether there is an equity cushion in the Collateral, contrary to the argument made by the Debtors in Section C of the DIP Financing Motion, granting the Proposed DIP Lender a priming lien for $4 million would result in a diminution of Pre-Petition Lenders' interest in the amount of $4 million. In *Swedeland*, the Third Circuit Court of Appeals concluded that:

> The district court ruled that the bankruptcy court's findings were clearly erroneous because Swedeland offered no new consideration to Carteret to offset its diminution of interest as a result of the superpriority lien given to First Fidelity. Accordingly, none of the factors the bankruptcy court enumerated showed Carteret had adequate protection. We agree with the district court.

16 F.3d at 564-565. Especially in the absence of any evidence of the value of the Collateral, the only way to measure adequate protection is by using the amount of the priming loan. The Debtors do not offer any cash payments, any additional unencumbered collateral, or any other value of any kind to offset a $4 million diminution in the Pre-Petition Lenders' interests. Under *Swedeland*, the Pre-Petition Lenders are not adequately protected.

14. Next, even if an equity cushion alone could constitute adequate protection, irrespective of what equity cushion is sufficient, Debtors have not proffered any evidence whatsoever, and the burden is on them. As noted above, there is no evidence whatsoever as to whether Pre-Petition Lenders are oversecured or undersecured. The only evidence is that based on the Budget, the Pre-Petition Lenders will suffer an almost $4 million decline in their position as a result of the Proposed DIP Loan over the next 13 weeks.

15. Finally, Debtors assert that the Pre-Petition Lenders are adequately protected because the Collateral will be worth substantially more than the $4 million reduction in the Pre-Petition Lenders' collateral position (DIP Financing Motion, paragraph 34) if the Proposed DIP Loan is approved. In other words, Debtors assert, whatever the value of the Collateral now, it will increase by more than $4 million. Notwithstanding that there is no evidence whatsoever for this unsubstantiated assertion, under applicable bankruptcy law, shifting the risk from the Debtors to the Pre-Petition Lenders who bargained for first priority collateral coverage and will not benefit from any of the upside through granting a priming lien is not proper, and a priming lien is not warranted. *In re Mosello*, 195 B.R. 277, 293 (Bankr. S.D.N.Y. 1996) ("In this case the secured creditor is being made to subordinate so that those with lower priority can potentially make a profit. This is not to be allowed"). Debtors propose to operate at a $2.7 million loss for 13 weeks, while consuming every dollar of cash collected from operations, in a precarious market, and call that

operation alone "adequate protection." It is not. *Swedeland*, 16 F.3d at 567 ("Congress did not contemplate that a creditor could find its priority position eroded and as compensation be offered an opportunity to recoup dependent upon the success of a business with inherent risky prospects.").

16. The Debtors rely heavily on *Fontainebleau* and *In re Yellowstone Mountain Club*, No. 08-61570-11, 2008 WL 5875547 (Bankr. D. Mont. Dec. 17, 2008). Neither supports the Debtors' position on priming. In *Fontainebleau*, the court denied a priming lien exactly because the debtors there had not offered any tangible additional collateral to offset the loss caused by the priming lien. *Fontainebleau*, 434 B.R. 753-54. In *Yellowstone*, the priming lien was approved, because the Debtors offered unencumbered collateral worth many times the value of the cash sought to be used by the Debtors. *See id.* at 752-53 (discussing *Yellowstone*).

17. Debtors have not even attempted to meet their burden of proof to establish that the Pre-Petition Lenders would be adequately protected. Debtors have failed to satisfy the requirements of Bankruptcy Code Sections 364(d)(1)(B) and 364(d)(2), and on that basis alone, the DIP Financing Motion should be denied.

**B. Debtors Cannot Satisfy the Requirements of Bankruptcy Code Section 364(d)(1)(A)**

18. Bankruptcy Code Section 364(d)(1)(A) provides that the Court may authorize a DIP loan secured by a senior lien (i.e., a priming lien) or equal lien on property of the estate that is subject to a lien only if Debtors are "unable to obtain such credit otherwise." A "bankruptcy court must make its decision as to how extensive the debtor's unsuccessful efforts to obtain credit must be on a case by case basis; there is no duty to seek credit from every possible lender, but debtor must make an effort to establish that debtor is unable to obtain credit otherwise." *In Re Reading Tube Industries*, 72 B.R. 329 (Bankr. E.D. Pa. 1987). In this case, in a best case scenario for Debtors, it is premature to conclude that they are unable to obtain financing other than through

a priming loan based on offers from (i) the Pre-Petition Lenders, and (ii) the Proposed Junior DIP Lender.

19.   First, on July 11, 2020, the Pre-Petition Lenders presented a term sheet to the Debtors for DIP Financing (the "Term Sheet").  Between July 11, 2020, and July 19, 2020, the parties exchanged several drafts - - Debtors provided a markup of the July 11, 2020 Term Sheet on July 13, 2020, the Pre-Petition Lenders provided a further draft the same day, the Debtors provided a markup on July 18, 2020, and the Pre-Petition Lenders provided a further draft the same day, a copy of which is attached hereto as Exhibit 1.  The latest draft was based on a conference call with respective clients and counsel for the Pre-Petition Lenders and the Debtors, which conference call the CRO described as "productive."  On July 19, 2020, Debtors' counsel responded to the draft of the Term Sheet resulting from the productive call with a one-line email indicating that "the CRO cannot agree to the term sheet your client proposed in its current form."  Counsel did not indicate any requested changes and in response to Agent's counsel's inquiry, Debtors' counsel indicated that the Agent would need to speak with CRO.  The Agent reached out to the CRO, who did not respond.  Several additional inquiries by the Agent's counsel to Debtors' counsel were never answered.  Only at his deposition on July 20, 2020, in response to a question, did the CRO provide a response – he testified that the parties were too far apart and that Debtors decided that they would not respond further.  Instead, they would seek to obtain a priming loan.  Debtors filed the DIP Financing Motion during the CRO's deposition.

20.   Inexplicably, Debtors and the CRO have not identified the open issues on the Term Sheet and have refused to engage in further negotiations with the Pre-Petition Lenders.  The Pre-Petition Lenders remain willing to work with the Debtors for not only consensual DIP financing, but also exit financing in the amount of at least $6 million to capitalize the operating Debtors' Las

Vegas commercial linen service operations coming out of bankruptcy, which the Pre-Petition Lenders have communicated to the Debtors.

21.     Second, on July 17, 2020, the Proposed Junior DIP Lender presented to the Debtors a term sheet for the Proposed Junior DIP Loan.  The Proposed Junior DIP Loan is not a priming loan. The Proposed Junior DIP Lender proposes DIP financing in the amount of $400,000, interest and fee/cost free, junior to the Pre-Petition Loans.  While the amount of the Proposed Junior DIP Loan is less that the Proposed DIP Loan, the CRO testified during his deposition that he did not undertake to negotiate a higher dollar amount loan from the Proposed Junior DIP Lender.  Rather, the CRO testified, notwithstanding that the Proposed DIP Loan had a high interest rate and fees, the Debtors determined to seek approval of the Proposed DIP Loan because the principal amount was the highest of available options.

22.     Based on the foregoing, Debtors have not demonstrated that they are unable to obtain "such credit otherwise."  In fact, there appears to be other sources of credit available to the Debtors that the Debtors did not fully or adequately pursue.    Therefore, Debtors cannot satisfy the requirements of Bankruptcy Code Section 364(d)(1)(A).

### III.    CONCLUSION

23.    For the reasons set forth above, a priming lien is not warranted because Debtors cannot meet their burden of proof and satisfy all (or even any) of the requirements of Bankruptcy Code Sections 364(d)(1)(A), (d)(1)(B), and (d)(2).  Based thereon, the Agent respectfully requests that the Court deny the DIP Financing Motion.

Dated:  July 21, 2020
          Wilmington, Delaware

**GIBBONS P.C.**

By:  *Natasha M. Songonuga*
Natasha Songonuga, Esq. (DE Bar #5391)
300 Delaware Avenue, Suite 1015
Wilmington, DE 19801-1671
T: 302-518-6300
F: 302-429-6294
E-mail: nsongonuga@gibbonslaw.com

- and –

**SHEPPARD MULLIN RICHTER & HAMPTON LLP**
Alan Feld, Esq. (admitted pro hac vice)
Ted Cohen, Esq. (admitted pro hac vice)
333 S. Hope Street, 43rd Floor
Los Angeles, CA 90071
E-mail: afeld@sheppardmullin.com
E-mail: tcohen@sheppardmullin.com